HERGET, Judge.
This is an appeal by plaintiff from a judg•ment rejecting his demands.
In a well-considered written opinion the 'Trial Court made findings of fact and disposed of the legal issues involved herein in which we concur, except as noted hereinafter. Its opinion follows:
“Plaintiff was injured on February 13, 1958 while operating a towmotor in the course of his employment with Kaiser Aluminum and Chemical Corporation in Baton Rouge. It is not disputed that he has been and is now receiving all the benefits afforded by the Workmen’s Compensation Law of this state. In this suit he seeks to recover from the public liability insurer of Kaiser, and from six named executive officers, directors, managing employees and stockholders of Kaiser for his personal injuries, medical expenses and loss of wages resulting from the accident. The individual defendants are: Glynn A. Blackledge, alleged to have been in charge of Kaiser's warehouse; Fred H. Raiford, Jr., alleged to have been in charge of loading and shipping at Kaiser’s plant; J. W. Tullier, alleged to have been in charge of Kaiser’s repair shop; James A. Wilson, alleged to have been Kaiser’s plant or works manager; James C. Gee, alleged to have been the manager of Kaiser’s purchasing department; and James D. Ploag, alleged to have been Kaiser’s safety director or safety engineer. Plaintiff alleges his injuries resulted from the negligent acts of omission and commission of the individual defendants. It is stipulated that the policy of public liability insurance issued to Kaiser by the defendant insurer and in force and effect at the time of the accident, insured against damage caused by the negligence of the individual defendants.
“It is not necessary to describe the tow-motor beyond saying that it is a short, heavy tractor type motor vehicle equipped with large metal prongs projecting forward at a low level from the front ‘of the machine. These prongs are inserted under materials to be" moved, the materials are then lifted, transported, and unloaded. The machine is also called a forklift type truck. While it is undoubtedly well adapted to the purposes stated, the evidence shows that it is not as maneuverable as the average motor vehicle.
*664 “Plaintiff testified he had been employed at Kaiser’s approximately three and one-half years at the time of the accident; that he was- the most experienced towmotor operator there; that he was classified as a warehouseman, but that when the services of a towmotor were required he was assigned to operate it. On occasions other employees operated townmotors. The plant operated three of these machines. A small one was used exclusively in the warehouse; a larger one, No. 59, usually operated by plaintiff; and a still larger one, No. 62. The latter two were used in outside work, chiefly in the area of the docks on the river.
“It is the testimony of the plaintiff that on the morning of February 11, 1958 he was instructed by Blackledge to proceed with towmotor 59 to the docks area; that the regular roads to the docks were closed for construction and repairs; that a temporary road afforded the only access to the docks; that it was raining and the road was muddy and slick; that the road ran down what is known as the north hill with an incline of approximately 15 to 20 degrees, then up what is known as the south hill with an incline of approximately 40 to 45 degrees. Plaintiff says he protested to Blackledge that he could not operate the towmotor up this incline on the south hill. Blackledge sent a winch truck ahead of the towmotor to assist it over the incline. Plaintiff testified that in going down the incline on the north hill the towmotor’s brakes failed, it skidded, and came to rest off the road. On instructions of Blackledge, and with the assistance of the winch truck, he returned towmotor 59 to the shop for brake repairs. He was then instructed by Blackledge to proceed with towmotor 62 to the docks area. The winch truck pulled 62 over the incline. At the end of the work day he telephoned for instructions and was instructed to leave 62 on the docks area.
“On the morning of February 12 it was snowing. Another employee was assigned to operate 62 on the docks area. Plaintiff was assigned to operate 59 elsewhere. He said the brakes on 59 were good. At noon on that date he was instructed by Black-ledge to proceed with 59 to the docks area. The winch truck pulled 59 over the incline. At the end of that work day he again telephoned for instructions and was instructed to leave 59 on the docks area.
“Plaintiff testified that when he reported for work at 7 a. m. on February 13 the ground was frozen; that Blackledge instructed him to proceed to the docks area, finish his work there and return towmotor 59 to the warehouse; that he protested the hazardous situation to Walter B. .Jordan, a fellow employee who was the steward representing the union local of which both were members; and that Jordan protested to Blackledge. Both plaintiff and Jordan testified Jordan told plaintiff that if he refused to obey orders he was subject to being discharged. Plaintiff was sent to the docks area in a pickup truck driven by Ernest J. Guidroz.
“According to plaintiff’s testimony he finished his work in the docks area in 30 to 45 minutes and proceeded on his return trip to the warehouse; that in going down the incline on the south hill the brakes on 59 failed again and it turned over, injuring him.
“Both plaintiff and Jordan testified plaintiff talked with Jordan on February 11 about the failure of the brakes on towmotor 59, and that plaintiff complained about the unsafe condition of the road. Jordan testified he discussed this with Blackledge and the latter said he was interested in making it safe; that they discussed ways and means of getting the towmotor to the docks; that Blackledge mentioned the possibility of using a winch truck for that purpose, but that he did not hear any orders or instructions to that effect. He further testified that on the morning of February 13, after plaintiff’s protest to him, he talked with Blackledge, and he is almost certain plaintiff heard the conversation. Jordan told Blackledge that plaintiff objected to going to the docks area to finish the work be *665 cause he considered it unsafe to do so. Blackledge replied that he wouldn’t send anyone to work if it wasn’t safe.
“Guidroz testified he heard Blackledge tell plaintiff to go finish the work on the docks area and return to the warehouse. Neither Jordan nor Guidroz testified the return of the towmotor over the incline was mentioned. Jordan testified plaintiff’s complaint to him covered the area and situation as a whole.
“Blackledge testified that the temporary road was unsafe; that he does not recall any complaints made to him by plaintiff or Jordan on the morning of February 13; that he ordered plaintiff to finish the work on the docks area and return with the equipment; that he did not order a winch truck to assist the towmotor down the incline on the south hill.
“Raiford testified that he was in charge of the loading being done by plaintiff on the afternoon of February 12 and the morning of February 13; that the towmotor and its operator, plaintiff, had been furnished to him at his request by Blackledge; that at the end of plaintiff’s work day on February 12, he, Raiford, advised Blackledge that plaintiff could finish the job in about one hour; that he was on the docks area supervising plaintiff’s work on the morning of February 13; that he left the docks area to return to the warehouse when, according to his estimate, plaintiff would have the job completed in 10 or IS minutes; that he was going to the warehouse to have a winch truck sent to assist plaintiff’s towmotor down the incline; that he did not inform plaintiff of this; that when he arrived at the warehouse he learned that Blackledge had gone to the purchasing office; that he did not have time to call him; that 20 or 30 minutes after reaching the warehouse he learned of plaintiff’s accident. He admitted that at the taking of his deposition shortly before the trial he stated that this elapsed time might have been as long as 40 minutes.
“At the conclusion of the trial of this case the writer informally gave to counsel for the parties a finding of material facts reading as follows:
“ ‘At the time of the accident and for at least two days prior thereto the temporary road was the only available route for vehicles traveling between the warehouse and the docks area; that it was unsafe for the operation of tow-motors; that on February 11, 1958 plaintiff drove towmotor 62 from the warehouse and was assisted up the incline to the docks area by a winch truck; that on February 12 towmotor 62 was driven by another operator from the docks area to the warehouse without assistance down the incline; that on February 12 plaintiff drove tow-motor 59 from the warehouse and was assisted up the incline to the docks area by a winch truck; that on February 13 the defendant Blackledge ordered plaintiff to finish his work on the docks area and return towmotor 59 to the warehouse; that the defendant Rai-ford was aware of these orders; that plaintiff, Blackledge, and Raiford knew it was unsafe for the towmotor to be driven down the incline without assistance ; that plaintiff had not been instructed to await assistance before driving the towmotor down the incline, nor had he been informed that such assistance would be furnished; that neither Blackledge, Raiford, nor anyone else had taken any action toward furnishing such assistance.’
“To that finding of facts the following is now added:
“That plaintiff’s knowledge of the condition of the road was equal if not superior to that of defendants; that plaintiff’s knowledge of the operation of a towmotor was superior to that of defendants; that plaintiff was not instructed to drive the towmotor down the incline unaided; that he was not informed by any one of the defendants that his refusal to drive it down the incline unaided might result in his discharge from his employment.
*666 “In my opinion both Blackledge and Rai-ford were negligent in failing to have a winch truck available to assist the towmotor down the incline, or in failing to instruct plaintiff to wait at the docks until such assistance arrived. I find no negligence on the part of the other defendants. The next question to be determined is whether or not plaintiff was negligent in driving the towmotor down the incline unaided, and, if so, was such negligence the proximate cause of the accident, and did he assume the risk of such action. The general principles of law applicable to the factual situation here are found in 56 C.J.S., Master and Servant, sec. 402, cited by defendants:
“ ‘Although the servant has given notice and complained of the defect or danger, he assumes the risk where he is fully aware of, and appreciates, the danger to be incurred in obeying the master’s order, or where the danger in obeying the master’s order is so manifest, obvious, and imminent that a person of ordinary prudence and caution would not incur it; and this is true although the servant does the work under protest and although he was told that disobedience of the order would result in his discharge. Even the direct and immediate order of the master will not justify a servant in rashly exposing himself to a known and obvious danger.’
“Following this defendants have cited McKinney v. McNeely, 108 La. 27, 32 So. 199, the leading Louisiana case on the question here involved. In that case» plaintiff, a skilled mechanic, was working under the orders of defendant who ordered him to do certain work under such conditions and in such manner as rendered it palpably hazardous. In denying plaintiff recovery for injuries received in the performance of the work, the Court said:
“ ‘Therefore the conclusion seems irresistible that, if defendant was in fault in ordering the plaintiff into a position of such danger, plaintiff was in equal fault in obeying the order.’
“The above quotation is taken from the trial court’s opinion which was quoted with approval by the Supreme Court which went on to say:
“ ‘We have examined the record with care. A preponderance of evidence sustains defendant in contending that he gave no orders to the plaintiff to place his hand where he did, and that he had nothing to do with the insecure position in which the rudder was at the time of the accident, and that he in no' manner contributed to its falling. We think the judgment correct and it is hereby affirmed.’
“So here. None of the defendants ordered plaintiff to drive the towmotor down the incline unaided, and none of them was responsible for its traveling down the incline unaided at the time of the accident.
“Counsel for the parties have cited numerous authorities, many of them from other jurisdictions, on questions that in my opinion do not arise under the facts in this case. To me it does not appear to be an over-simplification of the issues here to say that the decisive issue is that of the contributory negligence of plaintiff. It is my opinion such negligence is clearly shown by the evidence, and that it was the proximate cause of the accident.
“For the reasons assigned there is judgment rejecting plaintiff’s demands.”
Exceptions of no cause or right of action were filed by defendants to the original and supplemental petitions, which exceptions, at the request of the defendants, were referred to the merits. The exceptions were not passed upon by the Trial Court. In this Court counsel for defendants abandoned the exceptions and therefore- we will not pass upon the merits thereof.
The Trial Court found both Black-ledge and Raiford negligent “ * * * in *667 failing to have a winch truck available to assist the towmotor down the incline, or in failing to instruct plaintiff to wait at the docks until such assistance arrived. * * ” Though the evidence does not show that these defendants had stationed at the site a winch truck to assist the operators of the towmotors in descending or ascending the incline, the evidence shows that where such assistance was requested by the towmotor operator a winch truck was made available. Furthermore, the grave danger of an attempt to go up or down the icy, snow-covered incline unassisted was apparent to the plaintiff, shown to have been an experienced towmotor operator, fully cognizant of the danger involved in attempting to maneuver the decline unassisted. Especially is this so in view of the fact that the plaintiff himself had suffered a near disabling accident only a short time before in attempting, unassisted, to maneuver a towmotor down an obviously less dangerous incline. The danger of the maneuver which plaintiff, an experienced operator, attempted was obvious, open, apparent, and he was fully cognizant thereof. Admittedly there was no direct unequivocal order given by the supervisor to plaintiff to maneuver the hill unassisted. It appears to us to be unwarranted to hold that the supervisor was negligent in failing to positively and specifically instruct the plaintiff not to drive the towmotor down the incline unassisted. Therefore, it is inconceivable that plaintiff could have reasonably interpreted his supervisor’s instruction to return the tow-motor when he had completed his work at the docks as being an order to do so unassisted; his attempt to perform such maneuver in the face of known obvious danger was the sole cause of his unfortunate accident. From his own experience and knowledge he was aware of the fact that upon a simple call assistance would have been afforded him to traverse the incline and there is absolutely no evidence to substantiate his contention that his request for such assistance would result in his being discharged. We therefore are of the opinion that plaintiff has failed to show that any of the defendants were guilty of negligence resulting in his injury, but that the sole proximate cause of the injury for which he seeks recovery was his gross fault in voluntarily and without compulsion from his superiors attempting to drive the tow-motor down the icy incline with full knowledge of the apparent hazardous, dangerous maneuver he was undertaking.
For these reasons, the judgment of the Trial Court is affirmed.
Affirmed.